738 July 29, 2026 No. 708

IN THE COURT OF APPEALS OF THE
STATE OF OREGON

STATE OF OREGON,
*Plaintiff-Respondent,*

*v.*

STEVEN MICHAEL KLAUS,
*Defendant-Appellant.*

Washington County Circuit Court
20CR35140, 23CR05129, 23CR03966;
A183454 (Control), A183455, A183456

Erik M. Buchér, Judge.

Argued and submitted February 5, 2026.

Lindsey Burrows argued the cause and filed the reply brief for appellant. On the opening brief were Ryan T. O'Connor and O'Connor Weber LLC.

Philip Thoennes, Assistant Attorney General, argued the cause for respondent. Also on the brief were Dan Rayfield, Attorney General, and Benjamin Gutman, Solicitor General.

Before Tookey, Presiding Judge, Kamins, Judge, and Jacquot, Judge.

KAMINS, J.

Reversed and remanded.

**KAMINS, J.**

In this consolidated criminal appeal, defendant appeals from judgments of convictions in three related cases. Following a stipulated facts bench trial, defendant was convicted of two counts of first-degree unlawful sexual penetration, ORS 163.411, five counts of first-degree sexual abuse, ORS 163.427, four counts of second-degree invasion of personal privacy, ORS 163.700, and two counts of using a child in a display of sexually explicit conduct, ORS 163.670. Defendant challenges the denial of his motion to suppress evidence found on a laptop that he purchased with his ex-wife and that was left at the family home after defendant moved out and the couple divorced. Defendant's ex-wife provided the laptop to law enforcement and consented to a search of its contents. Defendant, through counsel, objected to a search. After approximately six months, law enforcement obtained a search warrant and searched the laptop. Defendant argues that he had a privacy interest in the contents of the laptop, his ex-wife could not consent to the search, he did not abandon his privacy interest in the laptop, a nd the warrant was insufficiently particular and overbroad. We conclude that defendant had a privacy interest in at least some of the contents of the laptop, defendant did not abandon that interest, his ex-wife could not consent to a search of those contents, and the warrant was insufficiently particular as to those contents. Accordingly, we reverse and remand.

## I.   FACTS

"We review a trial court's ruling on a motion to suppress for errors of law, and we are bound by the trial court's findings of fact, provided they are supported by constitutionally sufficient evidence." *State v. Zweygartt*, 337 Or App 234, 236, 562 P3d 1106, *rev den*, 373 Or 738 (2025). "We state the facts consistent with the trial court's findings and its denial of defendant's motion to suppress." *State v. Bunch*, 305 Or App 61, 62, 468 P3d 973 (2020). "To the extent that the court did not make express findings, we presume that the court decided the facts in the light most favorable to the state." *Id.*

A.   *Defendant and Carder's Relationship*

In early 2010, defendant and Carder started dating and purchased a home together. They married in 2011. Defendant had three daughters from a prior relationship and Carder had two children from a prior relationship, including a daughter, Z. Around that time, defendant and Carder purchased a laptop computer. It was a household computer that stayed in public areas of the house and was used for "household stuff" like family photos and tax returns, but it was mostly used by defendant. Defendant would sometimes take it with him to his work overnight to kill time. It was password protected, but Carder knew the password.

In May 2019, the relationship between Carder and defendant "deteriorated" and Carder requested that defendant move out of the family home, or she would file a restraining order. Defendant moved out and Carder packed up "much of [defendant's] stuff" and dropped it off where he was staying. Defendant's daughters also brought over some of defendant's belongings to him "as needed." Defendant never asked for the laptop, and Carder retained possession of it.

Carder and defendant divorced in December 2019. In the judgment of dissolution, which incorporated an arbitration agreement between the parties, Carder and defendant agreed that they would have no trouble dividing up personal property, but if they had any issues, they could seek the arbitrator's help, even after entry of the dissolution judgment. In March 2020, defendant drove to Carder's home with movers to pick up some tools and other items that Carder had left in a storage trailer. When Carder believed the movers were taking more items than agreed upon, she called the police. Carder and defendant agreed that any further contact regarding exchange of items should happen through attorneys. Defendant never reached out through an attorney for any additional items, including the laptop, prior to finding out that the laptop was turned in to the police, and never sought an arbitrator's help (per the dissolution judgment) to claim the laptop.

In May 2020, a pipe burst in the home and Carder "packed a bunch of stuff" and dropped it off for defendant

and his daughters. Carder believed the laptop went into storage at that time, while the house was undergoing remediation. Carder fully moved out of the home a few months later and relocated to Redmond, bringing the laptop with her.

B.  *Z Discloses Sexual Abuse and Police Search the Laptop*

When Carder told her daughter, Z, that she and defendant were getting a divorce, Z disclosed that defendant was sexually abusing her. After an investigation, a grand jury indicted defendant on two counts of unlawful sexual penetration in the first degree, ORS 163.411, and five counts of first-degree sexual abuse, ORS 163.427, for acts that occurred between June 2010 and November 2016. As part of his defense strategy, defendant requested custody records of Z from Carder through a subpoena. Carder thought the records might be on the shared laptop. When searching the laptop, Carder discovered a document titled "A Serious Man" that had several hyperlinks with titles that indicated child sexual abuse materials (CSAM). The document appeared to be created by defendant. Carder emailed the district attorney, informing her about the document, and the district attorney disclosed Carder's email and the document to defendant. Defendant then emailed the district attorney's office to note his objection to any search of the laptop and requesting its return. The following month, Carder turned the laptop over to Detective Pomeroy at the Forest Grove Police Department and consented to a search of the device.

Approximately six months after receiving the laptop, Pomeroy prepared an affidavit and accompanying search warrant to search the device for evidence related to the crimes of encouraging child sex abuse in the second degree, ORS 163.686,[1] in addition to the crimes for which defendant was indicted: sexual abuse in the first degree,

---

[1] ORS 163.686 provides, in full:

"(1)  A person commits the crime of encouraging child sexual abuse in the second degree if the person:

"(a)(A)(i) Knowingly possesses or controls, or knowingly accesses with the intent to view, a visual recording of sexually explicit conduct involving a child for the purpose of arousing or satisfying the sexual desires of the person or another person; or

"(ii) Knowingly pays, exchanges or gives anything of value to obtain or view a visual recording of sexually explicit conduct involving a child for the

and unlawful sexual penetration in the first degree. In his affidavit, Pomeroy wrote that in his training and experience

> "individuals in [*sic*] engaged in child pornography will download and upload unlawful images and videos from via [*sic*] a variety of internet-based websites and applications. Those unlawful images and videos are often shared and traded among other users engaged in that activity via hyperlinks."

Pomeroy also described the document titled "A Serious Man." Pomeroy explained that he found posts online that said that one of the websites listed on the document had been taken down because it hosted child pornography, and that the name of another website was a reference to father-daughter incest. Based on his research, Pomeroy believed he had probable cause to search the laptop for evidence of encouraging child sexual abuse in the second degree, sexual abuse in the first degree, and unlawful sexual penetration in the first degree. Pomeroy requested, and was granted, a warrant to search, seize, and analyze the laptop for multiple types of digital evidence—both evidence that was located on the laptop, such as media files, as well as cloud-based evidence such as evidence "identifying the existence and use of cloud storage accounts, including service providers, usernames, and passwords." That warrant authorized a search for the following categories of evidence: (1) "user identification for digital devices and digital evidence"; (2) "log-in and password information for digital devices and digital evidence"; (3) "[m]edia [f]iles" such as "pictures, videos, and associated data"; (4) "[i]nternet [u]sage"; (5) "[r]ecords of [c]ommunication * * * including content of communications"; (6) evidence "identifying the existence and use of cloud storage accounts,

---

purpose of arousing or satisfying the sexual desires of the person or another person; and

"(B) Knows or is aware of and consciously disregards the fact that creation of the visual recording of sexually explicit conduct involved child abuse; or

"(b)(A) Knowingly pays, exchanges or gives anything of value to observe sexually explicit conduct by a child or knowingly observes, for the purpose of arousing or gratifying the sexual desire of the person, sexually explicit conduct by a child; and

"(B) Knows or is aware of and consciously disregards the fact that the conduct constitutes child abuse.

"(2) Encouraging child sexual abuse in the second degree is a Class C felony."

including service providers, usernames, and passwords"; and (7) evidence related to certain specific websites.

The search warrant was executed by Digital Forensics Investigator Hunter. The search brought up every media file on the computer, including "carved" files, which means files that had been previously deleted, and "cached" files, which create automatic copies of viewed images to store on the computer. Hunter found around 1,500 pictures that he believed showed minors engaged in sexually explicit conduct. He found them in "[v]arious locations," but did not specify the exact locations of each of the CSAM files he found. Hunter did, however, testify that "your typical carved images that we talked about, that deleted space" were some of the "various locations" in which he found images. He also found one image in an "Adobe Bridge cache[,]" which means that a user deleted the image but the image remained in the software program's cache. Hunter also found 52 videos of Z in a "little nuanced location" of a back-up of a phone that had been saved on the laptop. The videos were on a phone that someone had used a "program" to back up, which transferred those files on to the computer. The phone was named Steve's iPhone.[2] Seven of the videos contained nudity and appeared to be taken from a hidden camera in Z's bedroom. Hunter also found internet browsing history and searches that referred to child pornography.

C.   *Defendant's Motion to Suppress*

Defendant moved to suppress the evidence found on the laptop. In his written motion, defendant argued that he had constitutionally protected interests in the laptop that were violated by a warrant that was insufficiently particular.[3] Defendant contended that the warrant, as written, lacked specificity because it authorized a search for "almost any information or data" in his laptop, with "nothing in the computer *** that is off-limits." Defendant further argued that the warrant was overbroad because it allowed for a search of evidence beyond the time period where the crimes were alleged to have occurred, and beyond the scope of probable cause as it related to the "Serious Man" document.

---

[2] Defendant's first name is Steve.

[3] Defendant also argued that the warrant lacked probable cause that he committed any crime, but he has abandoned that argument on appeal.

The state, in its written response, argued that defendant did not have a possessory interest in the laptop at the time it was seized by law enforcement, defendant abandoned his constitutionally protected property interest in the laptop because he separated himself from it once the divorce was finalized, Carder had authority to consent to the search because the laptop was shared marital property, and the warrant—if required at all—was sufficiently particular.

The trial court denied defendant's motion to suppress. The court concluded that Carder owned the laptop because, although it was initially marital property, it became Carder's in the divorce when she kept the laptop and defendant did not seek an arbitrator's help to claim it. The court further ruled that Carder, as the owner of the laptop, had "the personal privacy interest in it" and could do anything she wanted to with it, including consent to a search. Alternatively, the court ruled that Carder was "at least joint owner" of the laptop with "at least a third party interest [in] it." The court did not reach any issues with the warrant.

Defendant proceeded to a stipulated facts trial where he was convicted, and this appeal followed.

## II.   ANALYSIS

We begin with a discussion of the nature of defendant's constitutionally protected interests in the laptop at the time it was seized and searched. After concluding that defendant had privacy and possessory interests in some, but not all, of the contents of the laptop, we consider whether defendant abandoned those interests and whether Carder could validly consent to an invasion of those interests. Finally, we examine whether the warrant was sufficiently particular. We conclude that defendant did not abandon his Article I, section 9, interests in the contents stored outside his laptop (such as cloud services or records of internet usage held by third parties), Carder's consent was invalid, and the warrant was insufficiently particular.

A.  *Defendant's Privacy Interest*

Among other rights, Article I, section 9, of the Oregon Constitution grants "the people" the right to be "secure * * *

against unreasonable search" of their "effects." "A search occurs when a person's privacy interests are invaded." *State v. Voyles*, 280 Or App 579, 584, 382 P3d 583, *rev den*, 360 Or 751 (2016) (internal quotation marks omitted). If a person has no privacy interest in property to begin with, then a search has not occurred. *State v. McCrary*, 266 Or App 513, 517, 337 P3d 1008 (2014).

"In Oregon, the right to privacy—the individual freedom from government scrutiny—protected by Article I, section 9, is not defined by private property or contractual rights, although such rights may inform the analysis in a given case." *State v. Lien/Wilverding*, 364 Or 750, 759-60, 441 P3d 185 (2019) (*Lien*). Rather, "the right to privacy protected by Article I, section 9, 'is the freedom from scrutiny as "*determined by social and legal norms of behavior*, such as trespass laws and conventions against eavesdropping."'" *Id.* (first quoting *State v. Newcomb*, 359 Or 756, 764, 375 P3d 434 (2016), then quoting *State v. Campbell*, 306 Or 157, 170, 759 P2d 1040 (1988), emphasis in *Lien*). "[T]he fundamental question *** is whether the government's conduct, 'if engaged in wholly at the discretion of the government, will significantly impair "the people's" freedom from scrutiny, for the protection of that freedom is the principle that underlies the prohibition on "unreasonable searches" set forth in Article I, section 9.'" *Id.* (quoting *Campbell*, 306 Or at 171); *see also State v. De Witt Simons*, 375 Or 70, 80, 587 P3d 311 (2026) ("Article I, section 9, on the other hand, does not focus on the expectation of privacy of the individual; rather, it focuses on the expectations that society sets for the conduct of our government.").

The right to privacy may also extend to objects that are discarded, or no longer in their original owner's physical possession. In *Lien*, for example, the defendants placed their trash in an opaque, closed garbage bin, and took their bins out to the street, expecting their trash to be collected and commingled with the other homes in the neighborhood. 364 Or at 753. The police, however, arranged for the trash collectors to retrieve the defendants' trash and search it, uncovering evidence of crimes. *Id.* In concluding that the defendants had a privacy interest in their trash, the Supreme Court

"first consider[ed] general social norms of behavior." *Id.* at 760. The court looked to local news articles, case law, and law review articles to conclude that "most Oregonians would consider their garbage to be private and deem it highly improper for others—curious neighbors, ex-spouses, employers, opponents in a lawsuit, journalists, and government officials, to name a few—to take away their garbage bin and scrutinize its contents." *Id.* at 761-62 (citing Chris Lydgate & Nick Budnick, *Rubbish!*, Willamette Week (Dec 11, 2017), http://w b ww.wweek.com/portland/article-1616-rubbish.html-2 (last accessed May 1, 2019), *California v. Greenwood*, 486 US 35, 50, 108 S Ct 1625, 100 L Ed 2d 30 (1988) (Brennan, J., dissenting), and Jonathan Simon, Katz *at Forty: A Sociological Jurisprudence Whose Time Has Come*, 41 UC Davis L Rev 935, 962 (2007)). Even the trash collector in the case testified that he would not collect garbage from a customer at the request of a private citizen because doing so would be an invasion of privacy. *Id.* at 761.

The court then considered "legal norms concerning personal privacy," observing that "[t]he common law, as well as other sources, such as statutes, administrative rules, and local ordinances, are informative concerning existing legal norms of behavior." *Id.* at 762. The court found it particularly relevant that the government's act, if done in a non-law-enforcement setting, would violate general civil law. The court observed that, in Oregon, there was a common law cause of action for tortious invasion of privacy, which was one of the few causes of action that allow for mental suffering damages. *Id.* at 763.

Applying those principles to this case, defendant did not have a privacy interest in the media files that were located on the laptop, because, under prevailing "legal norms" and "social norms," the laptop was no longer his property after the divorce, and thus his freedom from government scrutiny of those files was not "significantly" impaired. As the trial court explained, under Oregon law, when a married couple divorces, a court determines ownership of marital property (including marital assets purchased during the marriage, like the laptop). *See* ORS 107.105(1)(f) (providing jurisdiction for the court to divide property "as may be just and proper

in all the circumstances"). Once the dissolution judgment is filed, "the property division ordered shall be deemed effective for all purposes." ORS 107.105(3).

Here, the dissolution judgment incorporated the parties' arbitration agreement. That agreement stated that the parties agreed that they "will have no problem dividing their personal property, and had a brief discussion about use of the trailer to do this. The Arbitrator can be involved further, even after entry of Judgment, if there is any dispute about the personal property division." On numerous occasions, defendant either collected personal property, or received personal property, but never asked for the laptop, disputed ownership of the laptop, or involved the arbitrator further. Thus, under the divorce judgment, Carder owned the laptop and the files located on it.

Moreover, there is a legal and social norm that an ex-spouse does not have a right to privacy in personal property possessed by the other ex-spouse in a divorce. That norm is, in fact, reflected in the parties' divorce judgment. That judgment awarded "any keys that open or close property" to be delivered to the spouse receiving the locked property:

> "Each party is awarded keys that open or close property awarded to that party. This includes physical keys to real property, vehicles, lock boxes, computer systems, and the like, as well as electronic keys such as garage door openers. The party having keys associated with property awarded to the other party shall immediately deliver said keys to the other party, *keeping no copies for him or herself*."

(Emphasis added.) In other words, an ex-spouse cannot keep the physical or electronic keys to property awarded to the other spouse because they no longer have any possessory or privacy interest in the property. Under those norms, defendant had no "right to privacy" in files that were located on the laptop, because defendant no longer owned the laptop. Because defendant did not have a "right to privacy" in those files, no search of those files under Article I, section 9, occurred.[4]

---

[4] For similar reasons, no search as to those files occurred under the Fourth Amendment as well. *See Katz v. United States*, 389 US 347, 351-52, 88 S Ct 507, 19 L Ed 2d 576 (1967) (explaining test under Fourth Amendment).

However, just because defendant no longer owned the laptop—that is, no longer had a possessory ownership interest in the laptop itself under the norms of property law—does not necessarily mean that defendant had no privacy interest in anything accessible *from* the laptop. The search warrant for the laptop sought more than just media files that defendant may have created that were located on the laptop: it also sought access to over nine years' worth of defendant's digital data which could be stored elsewhere: cloud storage accounts, "including service providers, usernames, and passwords," during the time frame of the criminal activity; internet browsing history; and records of communication.

The Supreme Court has recently explained that "Oregonians enjoy a right to privacy [under Article I, section 9,] in their internet communications, even when accessing the internet via a third-party provider." *De Witt Simons*, 375 Or at 88. In *De Witt Simons*, the defendant accessed the internet from his laptop at home through a nearby public Wi-Fi network. *Id.* at 73. The owner of the Wi-Fi network provided the police with a year's worth of all the unencrypted traffic it had collected from the defendant's computer, which included the content of the communication that the computer was having with the internet. *Id.* at 76. The police identified the defendant as the owner of the computer by employing a directional antenna at times when the defendant was logged onto the Wi-Fi network to determine the physical location of the defendant's signal. *Id.* The police then obtained a warrant to search the defendant's laptop, which revealed CSAM. *Id.* at 77.

The *De Witt Simons* court concluded that the defendant had an Article I, section 9, privacy right in "internet activities" conducted on the public Wi-Fi network. After acknowledging that "the use of the internet is a modern necessity, and wireless access is part and parcel of that," 375 Or at 83, the court concluded that the "societal norm that a person's internet searches and browsing activities are reasonably considered to be private" granted them constitutional protections. *Id.* at 87; *see also id.* at 88 ("[T]he mere fact that, to access the internet, society has accepted that multiple private entities along the path of a communication

may, in theory, monitor the traffic does not equate to social acceptance that the government would use Wi-Fi networks to surveil its citizenry.").

If the defendant in *De Witt Simons* had a privacy right in internet use conducted through a third party's public Wi-Fi, then defendant here must have a privacy right in the digital data stored by third parties at issue in this case. Here, the state sought not only access to files stored on the laptop that defendant no longer owned, but also access to digital data stored by third parties: for example, cloud services, communications, and internet browsing activity, all of which could potentially be accessed through other devices. While social and legal norms in this case would allow for government intrusion on the files stored directly on the laptop, a person would likely object to a government search of years of his Dropbox, Google Drive, or iPhoto Library, merely because he logged onto those accounts on a shared computer at some point in the past. *See State v. Bellar*, 231 Or App 80, 110, 217 P3d 1094 (2009), *rev den*, 348 Or 291 (2010) (Sercombe, J., dissenting) ("[O]ur social norms are evolving away from the storage of personal data on computer hard drives to retention of that information in the 'cloud,' on servers owned by internet service providers. That information can then be generated and accessed by hand-carried personal computing devices. I suspect that most citizens would regard that data as no less confidential or private because it was stored on a server owned by someone else."). Such an invasion, absent a warrant, would constitute an unreasonable search under Article I, section 9.[5]

B.  *Abandonment*

The state argues, as an alternative ground for affirmance, that even if defendant retained some privacy interest in the digital data following the divorce, defendant abandoned that interest through affirmative actions (or failures to act) that demonstrated an intent to relinquish his interests. The trial court did not make express findings on

---

[5] We emphasize that, unlike the defendant in *De Witt Simons*, who retained a privacy right in his internet usage stored by third parties (and, presumably, in all the content remaining on his laptop), defendant here retained no privacy right in communications stored on the laptop itself, because defendant no longer owned the laptop following the divorce.

abandonment; however, the parties argued abandonment below, and the record was adequately developed, so we may resolve the argument on appeal. *See Sherertz v. Brownstein Rask*, 314 Or App 331, 341, 498 P3d 850 (2021), *rev den*, 369 Or 338 (2022) ("If [an] argument is properly presented again on appeal and raises a question of law, we may simply resolve it, typically remanding only if it is necessary for the trial court to make factual findings from conflicting evidence, exercise discretion, or the like."). The issue before us is whether the facts support that defendant abandoned his privacy interest in data stored outside the laptop. As we explain, the facts do not support that conclusion.

A person with a protected privacy interest in property can relinquish that interest by abandoning the property. *State v. Cook*, 332 Or 601, 34 P3d 156 (2001). Any abandonment must be clear and requires "an unequivocal manifestation of an intention to relinquish all constitutionally protected interests in the affected property." *Bunch*, 305 Or App at 69. "It is the state's burden to prove by a preponderance of the evidence that a defendant abandoned his interest in a given item of property." *State v. Laney*, 318 Or App 509, 516, 507 P3d 308 (2022).

We have previously identified several factors that may be relevant in assessing whether a person has abandoned their Article I, section 9, interest:

- Actions taken by the police in relation to the property (*e.g.*, whether they lawfully requested defendant to step away from the property, obtained it through illegal conduct, etc.)

- Location where the property was left (*e.g.*, public or private property)

- Circumstances surrounding how the defendant left the property (*e.g.*, left in plain view, hidden, left in a way that others would find it, left in a way to demonstrate continuing control)

- Whether the defendant gave up their rights to control the disposition of the property.

*State v. Ipsen*, 288 Or App 395, 399-400, 406 P3d 105 (2017).

At the outset, we note that our existing case law, which so far has only identified factors for determining abandonment of physical property, may not be as helpful in determining the proper analytical framework for analyzing abandonment of *digital* property. For example, the "location where the property was left" poses several questions. Does digital data accessible through the cloud exist on the devices on which the data can be accessed or on a third-party's servers? *See United States v. Hunt*, 153 F4th 858, 865 (9th Cir 2025) (holding the Fourth Amendment's "reasonable expectation of privacy framework" requires adapting the abandonment doctrine in light of the "unique characteristics of cellphone data" and concluding that "the abandonment doctrine can apply to cellphone data but courts should analyze the physical phone and its data separately to determine whether the circumstances allow the conclusion that there was an intent to abandon either"); *State v. Mansor*, 363 Or 185, 217, 421 P3d 323 (2018) ("We do not think that it is useful to conceive of a computer as consisting of multiple 'rooms' or containers, and a valid warrant to search a computer need not identify 'places' to search at that level of abstraction.").

However, some governing principles undoubtedly apply. First, we are mindful that the United States Supreme Court has explained that the privacy interests in digital data are equal to or surpass those of a home, *Riley v. California*, 573 US 373, 396-97, 134 S Ct 2473, 189 L Ed 2d 430 (2014), and the Oregon Supreme Court has found that reasoning to be "persuasive." *Mansor*, 363 Or at 222 (citing *Riley*). Second, the vast majority of people conduct their business online, making digital data an "essential" and necessary part of modern life. *See De Witt Simons*, 375 Or at 82-84 ("Nearly every member of society, young or old, rich or poor, housed or unhoused, will use the internet to conduct what they intend to be private business—indeed, in many cases they must do so. In our age of paperless billing and cloud-based storage, health records are accessed and finances are managed online."); Steven Arango, *Cloudy with a Chance of Government Intrusion: The Third-Party Doctrine in the 21st Century*, 69 Cath U L Rev 723, 734 (2020) (advocating for greater protection against warrantless searches of cloud

data, and stating, "Today's world requires speed, access, and reliability—only the cloud can provide all three of these features. Cloud storage is not merely beneficial to everyday life, it is essential." (Footnotes omitted.)). In the context of abandonment, then, the intent to relinquish interests in digital data must be exceedingly clear, to overcome such strong privacy interests in an "essential" facet of modern life.[6]

Put together, we conclude that the state did not meet its burden to demonstrate that defendant intentionally relinquished all of his protected interests in his digital data stored by third parties. The state cannot point to any evidence in the record, such as defendant giving his cloud accounts and passwords to another person to use instead of him, canceling his email accounts, or demonstrating affirmatively that he no longer wished to continue using his accounts, that would indicate he no longer had rights in his digital data. The state merely points to defendant's inaction as it relates to the physical laptop itself: defendant did not attempt to hide the laptop, did not manifest an attempt to maintain control over it, failed to assert any ownership interest in the laptop during the divorce proceedings, and

---

[6] State courts that have compared abandonment of a digital device, like a laptop or a phone, to abandonment of all the digital data accessible from the device are split, although it appears that the majority of jurisdictions do not apply a different test for abandonment of a digital device from its data. *See Commonwealth v. Elverton*, No. 1183 WDA 2022, 2023 WL 8883434 at \*46 (Pa Super Ct 2023) ("Since *Riley*, lower courts have not reached a clear consensus on how *Riley* effects the abandonment doctrines as applied to cell phones, if at all."); *State v. Brown*, 423 SC 519, 524, 815 SE 2d 761, 764 (2018) (upholding warrantless search of password-protected cellphone under Fourth Amendment abandonment doctrine when the phone had been left in police custody for days without anyone claiming it); *State v. Samalia*, 186 Wash 2d 262, 274, 375 P3d 1082, 1088 (2016) (declining to adopt "special rules" for abandoned cell phones). However, at least one court, applying the privacy rationale from *Riley*, has concluded that a "categorical rule permitting warrantless searches of abandoned cell phones, the contents of which are password protected, is \*\*\* unconstitutional." *State v. K. C.*, 207 So 3d 951 (Fla 4th Dist Ct App 2016), *cert den*, 582 US 922 (2017). And it appears that, out of the few federal courts that have addressed the issue, the Ninth Circuit has advocated for a similar approach as ours. *See Hunt*, 153 F4th at 866-68 (following *Riley*, applying the abandonment doctrine to cellphones "while accounting for the unique aspects of cellphone data" may require courts "to distinguish a digital device from the data it contains to preserve the degree of privacy that existed at the time of the Fourth Amendment's adoption" but declining to conduct a separate analysis because the record did not establish that the defendant had abandoned his phone).

failed to return to arbitration after the divorce. Those facts do not address steps defendant did or did not take regarding his digital data. The state thus failed to meet its burden to demonstrate abandonment of the digital data that was not solely on the laptop.

C.   *Consent*

The state next argues, as an alternative ground for affirmance, that Carder could provide valid consent for police to search defendant's digital data on the laptop. Like abandonment, the parties argued consent to the trial court and sufficiently developed the factual record, so we may affirm on that basis. *Sherertz*, 314 Or App at 341. After considering the issue, however, we decline to affirm on consent grounds.

Consent is an exception to the warrant requirement. *State v. Bonilla*, 358 Or 475, 486, 366 P3d 331 (2015). "When the state relies on consent, it must prove by a preponderance of the evidence that 'someone having the authority to do so' voluntarily gave the police consent to search the defendant's property and that any limitations on the scope of the consent were complied with." *Id.* at 481 (quoting *State v. Weaver*, 319 Or 212, 219, 874 P2d 1322 (1994)). "In determining whether a third party had the authority to consent, the trial court 'must consider the totality of circumstances, including facts that may not have been available to the police when the decision to search was made.'" *Voyles*, 280 Or App at 585 (quoting *Bonilla*, 358 Or at 492).

In the physical search context, when two people have actual authority over a shared space, either person may consent to a search, "based on her or his own property interest." *Bonilla*, 358 Or at 486; *see also State v. Dowdy*, 117 Or App 414, 419, 844 P2d 263 (1992) (where person with common authority over hotel room consented to a search, the defendant's "privacy interest in the room was not violated"). "That is the risk of cotenancy." *State v. Gonzalez-Coria*, 318 Or App 524, 534, 508 P3d 52, *rev den*, 370 Or 197 (2022).

Here, the state did not meet its burden, based on the totality of the circumstances, to show that Carder had actual authority to consent to the search of all the digital

data, as opposed to the data that was located on the laptop. There was no evidence in the record that Carder had access to defendant's cloud accounts, or had a property interest in defendant's digital data, such that she could consent to a search.

In arguing otherwise, the state points to the fact that Carder knew the password to the laptop and had full access to the laptop. *See State v. Solorio*, 304 Or App 666, 675, 468 P3d 522 (2020) (suggesting that girlfriend could have authority to consent to a search of a safe if defendant gave her the combination along with permission to enter the safe). The state also notes that there was no evidence in the record that defendant had a right to exclude others from the laptop. *See Voyles*, 280 Or App at 586 (sufficient evidence that property owners could consent to a search of their property when, significantly, there was "nothing in the record to indicate that defendant had *any* exclusive or even joint control over the third parties' real properties that gave her the right to exclude the property owners from using parts of their own properties" (emphasis in original)).

Those arguments miss the mark. While Carder, as a co-owner, may have been able to consent to a search of the laptop itself, that is qualitatively different from whether she could consent to a search of defendant's cloud account, or externally stored records of communication or internet browsing history. There was no evidence that defendant granted Carder permission to access his full array of digital data, as distinct from the data that was located on the laptop. *See State v. Sobczak*, 347 Wis 2d 724, 751, 833 NW 2d 59, 72 (2013) (consent of girlfriend to search the defendant's laptop was valid when the defendant granted the girlfriend explicit permission to use the laptop without any limitation, the girlfriend used the laptop in a common area of the house, the police opened only the files that the girlfriend found before applying for a search warrant, and the files inspected on consent were not password protected and were "accessible to anyone."). The state thus failed to meet its burden to establish that Carder possessed authority to consent to a search of defendant's digital data stored externally from the laptop.

D.  *Warrant*

As we have explained, defendant maintained a privacy interest in his digital data, notwithstanding Carder's ownership of the laptop following the divorce and purported consent to its search. Given that the state does not argue that any other exception to the warrant requirement applied to defendant's digital data, police were required to obtain a warrant in order to invade defendant's privacy interests through a search. *State v. McCarthy*, 369 Or 129, 131, 501 P3d 478 (2021). As mentioned, police here did obtain a warrant after seizing defendant's laptop. The next issue, then, is whether the warrant obtained by police was sufficient to justify the search. For the reasons that follow, the warrant was deficient in several aspects.

A warrant must be supported by probable cause—that is, "the facts upon which the warrant is premised must lead a reasonable person to believe that seizable things will probably be found in the location to be searched." *State v. Anspach*, 298 Or 375, 380-81, 692 P2d 602 (1984); ORS 133.545(6). "Probably" means "more likely than not." *State v. Maxfield*, 133 Or App 371, 374, 891 P2d 1342, *adh'd to as modified on recons*, 134 Or App 542, 896 P2d 581 (1995) (internal quotation marks omitted). For Fourth Amendment purposes, probable cause means "a fair probability that contraband or evidence of a crime will be found in a particular place." *Illinois v. Gates*, 462 US 213, 238, 103 S Ct 2317, 76 L Ed 2d 527 (1983).

In addition to being supported by probable cause, a warrant must be sufficiently particular, that is, it must "particularly describ[e] the place to be searched, and the person or thing to be seized." Or Const, Art I, § 9; ORS 133.565 (2)(b); US Const, Amend IV (providing same). The purpose of the particularity requirement is a prohibition against "general warrants whereby administrative officers determine what is and what is not to be seized." *State v. Rose*, 264 Or App 95, 106, 330 P3d 680, *rev den*, 356 Or 400 (2014) (internal quotation marks omitted); *Andresen v. Maryland*, 427 US 463, 480, 96 S Ct 2737, 49 L Ed 2d 627 (1976) (general warrants that allow "exploratory rummaging in a person's belongings" are prohibited by the Fourth Amendment).

To meet the particularity requirement of Article I, section 9, "a warrant authorizing the search of digital devices 'must identify, as specifically as reasonably possible in the circumstances, the information to be searched for, including, if relevant and available, the time period during which that information was created, accessed, or otherwise used.'" *State v. Myers*, 338 Or App 59, 565 P3d 463 (2025) (quoting *Mansor*, 363 Or at 218). "If the warrant describes the information sought with that degree of specificity, and if the supporting affidavit supplies probable cause to justify the described search, then the warrant satisfies the particularity requirement of Article I, section 9." *State v. Turay*, 371 Or 128, 149-50, 532 P3d 57 (2023); *see also Mansor*, 363 Or at 219-20 (applying that standard and concluding that the warrant to search for internet history from a specific date was not facially unlawful).

The warrant must also satisfy the "overbreadth" component of Article I, section 9. That means that the warrant "must not authorize a search that is broader than the supporting affidavit provides probable cause to justify." *Turay*, 371 Or at 146 (internal quotation marks omitted).

Here, in the probable cause affidavit to support the application for the warrant, Pomeroy stated that he believed the laptop would contain evidence of the crimes of encouraging child sexual abuse in the second degree, ORS 163.686; sexual abuse in the first degree, ORS 163.427; and unlawful sexual penetration in the first degree, ORS 163.411.

With respect to those crimes, Pomeroy stated that defendant was arrested in June 2020 as a result of "an ongoing investigation with [defendant] and [Z]." Pomeroy stated that sexual abuse against Z occurred between 2010 and 2017, domestic violence against Carder happened on May 8, 2019, and defendant moved out of the home on May 20, 2019. Pomeroy also explained the facts around defendant and Carder's divorce, and how Carder discovered the "A Serious Man" document. Pomeroy described that, in his research of some of the links in the document, he found that one of the websites was pornographic and reported by users as containing CSAM, and another had a title that, according to Pomeroy's understanding of the Bible, referenced daughters

having an incestual relationship with their father. Finally, Pomeroy also explained that he knew, from his training and experience, that "individuals in [*sic*] engaged in child pornography will download and upload unlawful images and videos from via a variety of internet-based websites and applications," and that "[t]hose unlawful images and videos are often shared and traded among other users engaged in that activity via hyperlinks." Pomeroy did not explain, in his affidavit, the connection between "individuals engaged in child pornography" and the crimes of sexual abuse in the first degree, ORS 163.427; and unlawful sexual penetration in the first degree, ORS 163.411, nor any reason why, in his training and experience, he knew that individuals engaged in sexual abuse or unlawful sexual penetration store evidence of their crimes on a computer. Pomeroy also did not describe the alleged incidents that occurred against Z.

The warrant here contained the following seven search commands to search for evidence of the crimes of encouraging child sexual abuse in the second degree, ORS 163.686; sexual abuse in the first degree, ORS 163.427; and unlawful sexual penetration in the first degree, ORS 163.411:

"Evidence related to Digital Devices and Digital Evidence:

"[1]   Any and all documentation regarding user identification for digital devices and digital evidence (including but not limited to billing and purchase documentation);

"[2]   Any and all documentation regarding log-in and password information for digital devices and digital evidence;

"And as to the above digital devices and digital evidence, to further search for, seize, and analyze the digital items for the following:

"[3]   Media Files (pictures, videos, and associated data)—evidence related to the crimes under investigation during a time frame from January 1, 2010 to May 20, 2019;

"[4]   Internet Usage—evidence related to the crimes under investigation of connecting to, searching, and

browsing the internet during a time frame from January 1, 2010 to May 20, 2019;

"[5]    Records of Communication—evidence related to the crimes under investigation of engaging in communications (voice, video, email, text or otherwise), including content of communications, during a time frame from January 1, 2010 to May 20, 2019:

"[X]    All records of communication

"[6]    Cloud Storage—evidence related to the crimes under investigation identifying the existence and use of cloud storage accounts, including service providers, usernames, and passwords, during a time frame from January 1, 2010 to May 20, 2019;

"[7]    Websites—evidence related to the crimes under investigation of Tumblr.com, lmgbox.com and Pixvenue.com during a time frame from January 1, 2010 to May 20, 2019."

We address each command in turn.

1.  *First and Second Search Commands*

The first two search commands fail the particularity requirement, because they seek too much nonspecific information without any temporal limitation. *See State v. Bock (A169480)*, 310 Or App 329, 334, 485 P3d 931 (2021) (*Bock*) ("Any interpretation of the search command broad enough to permit the use of *any* material discovered on the cell phone relevant to establish the device owner or user's identity is impermissibly nonspecific." (Emphasis in original.)). In fact, the commands bear a striking resemblance to the impermissible commands from *Bock*. In that case, we concluded that a search command for "*Any evidence* identifying the owner/user of the device" was insufficiently particular because it required the executing officer to employ discretion in determining what to seize and thus was "tantamount to a general warrant." *Id.* at 335 (emphasis added). The first and second commands here, which seek "*any and all* documentation" regarding "user identification" for digital devices and digital data, as well as "log-in and password information," without any temporal limitation, are insufficiently particular.

2.   *Third and Fourth Search Command*

The third search command sought "Media Files (pictures, videos, and associated data)—evidence related to the crimes under investigation during a time frame from January 1, 2010 to May 20, 2019." The fourth search command sought "Internet Usage—evidence related to the crimes under investigation of connecting to, searching, and browsing the internet during a time frame from January 1, 2010 to May 20, 2019." To the extent that those commands seek digital data protected by Article I, section 9, those commands are insufficiently particular and overbroad. As mentioned, defendant was indicted for sexually abusing his stepdaughter based on acts that occurred between 2010 and 2016, and Pomeroy stated that the abuse occurred until 2017. There was nothing in the affidavit or the search warrant application that provided any reason why evidence of those crimes would be found on defendant's laptop for several years following the end of the abuse. *See State v. Serrano (A173250)*, 324 Or App 453, 459, 527 P3d 54 (2023) (affidavit cured lack of specificity in warrant when it "described in detail the videos and photos that the officer believed were evidence of the charges of sodomy and rape * * * that would be found on [the] defendant's phone" and "described the possible date ranges when the videos and photos were taken and when they had been uploaded to" various websites). The search command allowed the forensic specialist conducting the search to look for evidence related to *all* crimes that were under investigation without distinguishing between the crimes related to abuse of Z rather than child pornography, even though it did not establish that the laptop would contain media files or internet communications related to Z's abuse. As such, that command failed to describe the evidence "with as much specificity as reasonably possible under the circumstances [] so as to limit the enhanced risk of intrusion into defendant's privacy interests" with a digital search, *Turay*, 371 Or at 151. That is so because the command authorized a search for media files or internet communications related to Z from years beyond those for which Pomeroy had probable cause to believe that a crime had been committed against her. Moreover, the state testified that defendant did not even *own* the laptop prior to June 2010. Thus, even to the extent

that the "Serious Man" document, in conjunction with the investigation of defendant, provided probable cause that evidence of CSAM would be found on defendant's computer for the duration of defendant's ownership of the device, the command should have limited itself to the dates defendant actually owned the device. *See State v. Gaskill*, 340 Or App 459, 468-69, 571 P3d 769 (2025) (a cell phone search warrant that sought drug-related data beginning in August 2021 was sufficiently particular, notwithstanding the fact that the first controlled buy did not happen until several months later, because affidavit established that the defendant was under investigation for several months).

### 3.   *Fifth Search Command*

The fifth search command sought "Records of Communication—evidence related to the crimes under investigation of engaging in communications (voice, video, email, text or otherwise), including content of communications, during a time frame from January 1, 2010 to May 20, 2019." It further indicated it was seeking "all" records of communication. That command is insufficiently particular. It lacks any subject matter limitations on the communication, does not say who the communications would be between, and has a date range that is too long. *Compare Turay*, 371 Or at 151-52 (warrant search categories of "any other evidence related to the crimes" under investigation and "any evidence related to" ride-share apps were insufficiently particular because they sought information "at any time, in any location, in any circumstance" and "both failed to include dates, subject matter limitations, or other parameters that would have provided a reasonable degree of specificity to an officer executing those commands—despite the fact that more specific details about time periods and physical locations were known to the investigating detective" (internal quotation marks omitted)) *with Meyers*, 338 Or App at 70-71 (digital search warrant was sufficiently particular when it specified the phone numbers involved in communication with an undercover police officer and thus "limited the search to only the communications between the relevant phone numbers" and "effectively limited the search to the relevant timeframe") *and State v. Rose*, 264 Or App 95, 109,

330 P3d 680, *rev den*, 356 Or 400 (2014) (warrant was suffi-
ciently particular because it stated that police could search
for evidence of child sex abuse crimes "located in the elec-
tronic files stored in defendant's Yahoo account"). And sim-
ilarly to the third and fourth command, it sought evidence
on the laptop prior to defendant actually owning the laptop.

    5.   *Sixth Search Command*

       The sixth search command sought "Cloud Storage—
evidence related to the crimes under investigation identify-
ing the existence and use of cloud storage accounts, includ-
ing service providers, usernames, and passwords, during a
time frame from January 1, 2010 to May 20, 2019." For sim-
ilar reasons to the fifth search command, that search com-
mand was insufficiently particular. As mentioned, individu-
als store a vast amount of data through their cloud accounts.
A search command that authorizes intrusion into the use of
one's entire cloud account for "evidence related to the crimes
under investigation" presents an "enhanced risk of intrusion
into [a] defendant's privacy interests," *Turay*, 371 Or at 151;
*see also State v. Savath*, 298 Or App 495, 501, 447 P3d 1
(2019) (concluding that the digital "warrant's summary
characterization of the information sought—'related to con-
trolled substances offenses'—was insufficient to apprise the
executing officer of which items were or were not subject to
the warrant").

    6.   *Seventh Search Command*

       The seventh search command sought "Websites—
evidence related to the crimes under investigation of
Tumblr.com, lmgbox.com and Pixvenue.com during a time
frame from January 1, 2010 to May 20, 2019." Other than
searching for evidence beyond the dates that defendant
actually owned the computer, that command satisfies the
particularity requirement.

E.  *Remedy*

       We conclude that defendant possessed a privacy
interest in his digital data that was not stored on the laptop
and that the state did not meet its burden to demonstrate an
exception to the warrant requirement. Because the warrant

lacked the specificity required under Article I, section 9, it was invalid. On remand, the trial court can determine whether any of the evidence seized was stored by a third party and suppress that evidence.

Reversed and remanded.